UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1) ZM QUANT INVESTMENT LTD,<br>(2) BAIJUN OU, a/k/a "Eric Ou", and<br>(3) RUIQI LIU, a/k/a "Ricky Lau",<br><br>Defendants | Criminal No.  24cr10187<br><br>Violations:<br><br>Count One:<br>Conspiracy to Commit<br>Market Manipulation and Wire Fraud<br>(18 U.S.C. § 371)<br><br>Counts Two – Four:<br>Wire Fraud<br>(18 U.S.C. § 1343)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and<br>28 U.S.C. § 2461) |

INDICTMENT

At all times relevant to this Indictment:

General Allegations

1.   Defendant ZM QUANT INVESTMENT LTD ("ZM QUANT") was a company registered in the British Virgin Islands. ZM QUANT operated both inside and outside the United States. ZM QUANT had a public website ("www.zmquant.com") on which it purported to offer "market making" services for cryptocurrencies, such as the active monitoring of cryptocurrency trading and price fluctuations, trading in cryptocurrencies to capitalize on price fluctuations, and related consulting services. ZM QUANT received customer payments using its cryptocurrency wallets, including wallet address ending in fb99A (the "ZM QUANT Wallet").

2.   Defendant BAIJUN OU, a/k/a "Eric Ou" ("OU") lived in Hong Kong and worked for ZM QUANT.

3. Defendant RUIQI LIU, a/k/a "Ricky Lau" ("LIU") lived in the United Kingdom and Hong Kong and worked for ZM QUANT.

4. Co-conspirator 1 ("CC 1") and Co-conspirator 2 ("CC 2") were individuals who worked for ZM QUANT.

5. Maxwell Hernandez ("Hernandez") was an individual who lived in Massachusetts and who was involved in the creation and promotion of various cryptocurrency ventures, including Saitama LLC.

6. Russell Armand ("Armand") was an individual who lived in Texas and who was involved in the creation and promotion of various cryptocurrency ventures, including Saitama LLC and VZZN.

7. Nam Tran ("Tran") was an individual who lived in Washington State and who was involved in the creation and promotion of one or more cryptocurrency ventures, including Saitama LLC.

8. Manpreet Kohli ("Kohli") was an individual who lived in the United Kingdom and who was involved in the creation and promotion of one or more cryptocurrency ventures, including Saitama LLC.

9. Michael Thompson ("Thompson") was an individual who lived in Virginia and who was involved in the creation and promotion of one or more cryptocurrency ventures, including VZZN.

10. Saitama LLC ("Saitama") was a cryptocurrency company that was incorporated in Massachusetts on or about August 24, 2021. Saitama promoted a cryptocurrency token that operated on the Ethereum blockchain (the "Saitama Token"). The Saitama Token was a security

that at its peak had a market capitalization of $7.5 billion. Saitama also promoted the SaitaRealty real estate investment platform and the SaitaRealty cryptocurrency token.

11. VZZN was a cryptocurrency venture that promoted a cryptocurrency token that operated on the Ethereum blockchain (the "VZZN Token"). VZZN purported to create a video streaming service that could be used with the VZZN Token. The VZZN Token was a security.

12. The NexFundAI Token was a cryptocurrency token that operated on the Ethereum blockchain. The NexFundAI Token was a security.

## Background

13. Virtual currency is a digital asset or digital representation of value that can be electronically traded and exchanged online. Virtual currency is not backed or insured by a central bank and its value may or may not be tied to or secured by a fixed asset. Cryptocurrency is a subset of virtual currency that utilizes blockchain technology. Like many fiat currencies, many cryptocurrencies have a fluctuating, market-based value.

14. Ethereum is a well-known blockchain that can be used to create different cryptocurrencies, which are referred to in the cryptocurrency community as "tokens." Each Ethereum-based token has its own coding (or "smart contract") that governs how the token operates. Tokens built using the Ethereum blockchain are fungible, meaning they can be exchanged for other Ethereum-based tokens.

15. Cryptocurrency can be stored in a cryptocurrency "wallet" located, for example, in an electronic storage device, in a cloud-based server, or on a cryptocurrency exchange. Cryptocurrency transactions can be made between wallets.

16. Cryptocurrency "exchanges" are digital marketplaces where individuals can purchase or trade cryptocurrencies. During the relevant period, Uniswap, BitMart, XT.com, and

LBank were cryptocurrency exchanges that were available to the public, including to individuals in the United States.

### Overview of the Conspiracy and Scheme to Defraud

17. Beginning in or about 2022 and continuing through in or about 2024, ZM QUANT, OU, LIU, CC 1, CC 2, and others known and unknown to the Grand Jury conspired to manipulate the trading volume and price of various cryptocurrencies in order to profit through payments from cryptocurrency companies and from the sale of those cryptocurrencies at inflated prices.

### Objects and Purpose of the Conspiracy and Scheme to Defraud

18. The objects of the conspiracy and of the scheme to defraud were to commit market manipulation and wire fraud. The principal purpose of the conspiracy and of the scheme to defraud was for the conspirators to enrich themselves.

### Manner and Means of the Conspiracy and the Scheme to Defraud

19. Among the manner and means by which ZM QUANT, OU, LIU, CC 1, CC 2, and others known and unknown to the Grand Jury carried out the conspiracy and scheme to defraud were the following:

   a. Advertising purportedly legitimate services on ZM QUANT's public website while privately offering clients illegal services that included market manipulation;

   b. Engaging in manipulative trades to artificially increase the trading price and volume of cryptocurrencies for the purpose of inducing others to buy them;

   c. Using multiple cryptocurrency wallets to hide the source of the manipulative trades;

> d. Inducing cryptocurrency exchanges to reduce their trading fees in order to engage in manipulative trading of cryptocurrencies at a lower cost;
>
> e. Soliciting investors to buy cryptocurrencies through online marketing and messaging applications; and
>
> f. Selling cryptocurrencies for a profit, including at artificially inflated prices.

Overt Acts in Furtherance of the Conspiracy and Scheme to Defraud

20. On or about various dates between in or about 2022 and in or about 2024, ZM QUANT, OU, LIU, CC 1, and CC 2, together with others known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy and the scheme to defraud:

*Market Manipulation of the Saitama Token*

21. Beginning in or about 2022 and continuing through at least January 2023, ZM QUANT, OU, Kohli, Tran, Armand, Hernandez, and others coordinated a series of manipulative trades of the Saitama Token, including on the BitMart cryptocurrency exchange.

22. On or about April 19, 2022, Kohli created a private chatroom that included OU, Kholi, Tran, and Armand on Telegram, an encrypted, cloud-based messaging service. Kohli named the chatroom "Saitama MM."

23. On or about April 27, 2022, OU sent messages to the Saitama MM chatroom describing ZM QUANT's fee for making and supporting trades of Saitama Tokens. OU stated that ZM QUANT's "service fee" was "1500" and that ZM QUANT required an additional "5000-10000" and "equivalent tokens" to trade Saitama Tokens.

24. On or about April 28, 2022, OU sent a message to the Saitama MM chatroom requesting that funds be transferred to the ZM QUANT Wallet.

25. On or about April 30, 2022, Kohli transferred approximately $3,000 from a cryptocurrency wallet address ending in f27f5 to the ZM QUANT Wallet.

26. On or about May 1, 2022, Kohli sent a message to the Saitama MM chatroom confirming that the funds were transferred to ZM QUANT, to which OU responded, "Cheers."

27. On or about May 24, 2022, Kohli transferred approximately $4,500 from a cryptocurrency wallet address ending in 82f3C to the ZM QUANT Wallet.

28. On or about that same day, Kohli sent a message to the Saitama MM chatroom confirming that the funds had been transferred to ZM QUANT, to which OU responded, "Okay thanks!"

29. On or about June 21, 2022, OU sent a message to the Saitama MM chatroom requesting information about the Saitama Token. OU said, "I will give the team [the information] and do the analysis", to which Kohli responded, "Perfect. Let's do it mate and bring volumes high."

30. On or about June 22, 2022, OU sent a message to the Saitama MM chatroom requesting that additional payments be sent to the ZM QUANT Wallet.

31. On or about that same day, Kohli transferred approximately $6,000 from a cryptocurrency wallet address ending in fB06B to the ZM QUANT Wallet.

32. On or about June 27, 2022, Tran sent a message to the Saitama MM chatroom stating that "volume was down" on the BitMart cryptocurrency exchange. Tran said, "so now may need your help", to which OU responded, "Okay."

33. Between on or about June 27, 2022 and on or about June 29, 2022, ZM QUANT engaged in manipulative trades to increase the trading volume of the Saitama Token.

34. On or about June 30, 2022, OU sent a message to the Saitama MM chatroom stating that Saitama owed "7500" in services per month to support trading of the Saitama Token on four cryptocurrency exchanges and the SaitaRealty cryptocurrency token on one cryptocurrency exchange.

35. On or about January 18, 2023, CC 1 sent a Telegram message to OU, Kohli, Tran, Armand, and others, stating that there was a "high trade fee" on BitMart and that the "rate is 6.25%" to buy and sell Saitama Tokens. Tran responded, "Let me check with bitmart" to which CC 1 replied, "I'm going to pause the self trade for now."

*Offer to Manipulate the Market for the VZZN Token*

36. In or about March 2023, LIU, Thompson and others participated in a private chatroom on WhatsApp, an encrypted messaging service. The chatroom was named "ZMQ + VZZN". One of the chat participants identified LIU as a "business development manager" at ZM QUANT.

37. On or about March 7, 2023, LIU sent a Telegram message to the ZMQ + VZZN chatroom providing ZM QUANT's public website address.

38. On or about that same day, LIU sent a Telegram message to the ZMQ + VZZN chatroom providing a document entitled "MM Service Quotes" for "ZM Quant Investment Ltd." The document referenced ZM QUANT's public website but listed various ZM QUANT services that were not identified on ZM QUANT's public website, including:

   a. "Creating volume" on "Uniswap and Pancakeswap" for a cost of "1500 USDT."

7

b. "Trading bot" that will "create volume" and provide a "good and continuous candle chart" for cost of "1500 USDT (Monthly/per pair)."

*Market Manipulation of the NexFundAI Token*

39. On or about January 29, 2024, OU agreed that ZM QUANT would provide purported market making services for a new cryptocurrency project.

40. On or about February 6, 2024, OU sent a message to a private Telegram chatroom, "AI Token MM Needs ZMQ" (the "AI Token MM" chatroom) that included OU, Hernandez, and Armand. OU's message contained a document entitled "MM Service Quotes" for "ZM Quant Investment Ltd." The document referenced ZM QUANT's public website but listed various ZM QUANT services that were not identified on ZM QUANT's public website, including:

a. "Trading volume" services for "Centralized Exchange" to "create volume in accordance with your case" for a cost of "800 USDT (Monthly/per pair)."

b. "Trading bot for candle chart and volume" for "Centralized Exchange" to "demonstrate good and continuous candle chart" and "create volume in accordance with your case" for a cost of "1500 USDT (Monthly/per pair)."

c. "Creating volume" for "Decentralized Exchange" to "increase the trading volume" on "Uniswap" or "Pancakeswap" for a cost of "2500 USDT (Monthly/per pair)."

41. On or about March 7, 2024, LIU joined the AI Token MM chatroom.

42. During a phone call on or about that same day, LIU told Armand, Hernandez, and others the following about ZM QUANT's purported market making services:

    a. "The way we do market making on [Uniswap] is pretty easy[. . . .] The way we do that is we will use multiple wallets, for example, one thousand wallets, two thousand wallets, and we do the transactions maybe ten times each hour, or ten times every minute to reach the trading volumes. And when we hit the top gainer on Uniswap the users will come to trade, they will see the potential opportunities and they will chase the price, they will come to do trading. That's how we do market making on Uniswap."

    b. "The volume we provide" can be accomplished using "brand new wallets or we can create old wallets [. . .] because some users may track the trading data."

    c. "We can support you with resources. For example, if you need some marketing, we can provide our contractors or partners. And if you have your own marketing team we can combine with them as well."

43.   During a video teleconference on or about March 18, 2024, LIU and OU further described ZM QUANT's purported market making services to Armand, Hernandez, and others, as follows:

    a. LIU said, "we will use our wallets to do the trading maybe ten times per minute or twenty times a minute to make the trading volume more, to increase the trading volume. And if you guys have requirements on the price, for example, like, pump the price from one dollar to two dollars, we will give you a plan about how much we need [. . .] because pump the price needs our wallets to make many trades for the price to increase."

  b. LIU further said that ZM QUANT would coordinate to "cash out at the peaks," which was a reference to ZM QUANT's ability to sell the cryptocurrency tokens it controlled for a profit after artificially inflating the cryptocurrency's trading volume and price. LIU identified multiple cryptocurrency companies for which ZM QUANT had provided these services.

  c. OU said, "If we keep, like, trading we will change the wallets. We will not, like, keep using the fifteen wallets or twenty wallets. We will keep changing the wallets. Otherwise, like, people can check on the, can check [. . .] that just these fifteen wallets or twenty wallets keep trading. That looks so fake."

  d. OU also said, "For example, for our clients, if they need to cash out some tokens on Uniswap, we will keep changing the wallets. . . . Otherwise, like, people will know these wallets are you guys, that you guys are selling."

44. On or about April 29, 2024, OU sent a message to the AI Token MM chatroom that contained a document entitled "Service Agreement." Under the terms of the Service Agreement, NexFundAI would transfer cryptocurrency to the ZM QUANT Wallet in exchange for ZM QUANT trading and providing other services on the Uniswap cryptocurrency exchange.

45. On or about May 9, 2024, OU sent a message to the AI Token MM chatroom that contained a copy of the Service Agreement that had been signed by a representative of ZM QUANT.

46. On or about May 12, 2024, LIU, Armand, Hernandez, and others had a video teleconference. On that teleconference, LIU agreed that NexFundAI Token would launch on a

"test net" (an experimental blockchain used for testing) so that traders from ZM QUANT could conduct test trades prior to the NexFundAI Token being made publicly available on Uniswap.

47. Between on or about May 20, 2024, and on or about May 27, 2024, traders from ZM QUANT conducted more than 300 test trades of the NexFundAI Token on a "test net" for Ethereum cryptocurrency tokens.

48. On or about May 31, 2024, LIU sent a message to the AI Token MM chatroom listing hundreds of cryptocurrency wallets controlled by ZM QUANT that traders from ZM QUANT would use to make manipulative trades of the NexFundAI Token (the "ZM QUANT Trading Wallets").

49. On or about that same day, LIU sent a message to the AI Token MM chatroom stating that the plan was "to create the trading volume" and requesting that funds be sent to cryptocurrency wallet address ending in 944C6. LIU further said, "for 100K volume, we make 1000 transactions" and "[e]ach will cost about $3."

50. On or about that same day, CC 2 sent a message to the AI Token MM chatroom stating, "the program has started."

51. On or about that same day, traders from ZM QUANT made multiple trades of the NexFundAI Token on the Uniswap cryptocurrency exchange using the ZM QUANT Trading Wallets.

## COUNT ONE
### Conspiracy To Commit Market Manipulation and To Commit Wire Fraud
### (18 U.S.C. § 371)

The Grand Jury charges:

52.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 51.

53.  Beginning in at least in or about 2022 and continuing through 2024, in the District of Massachusetts and elsewhere, the defendants

>  (1) ZM QUANT INVESTMENT LTD,
>  (2) BAIJUN OU, a/k/a "Eric Ou", and
>  (3) RUIQI LIU, a/k/a "Ricky Lau",

conspired with CC 1, CC2, and others known and unknown to the Grand Jury to:

  a. commit market manipulation, that is, knowingly and willfully, by the use of the mails and any means and instrumentality of interstate commerce, directly and indirectly to effect a series of transactions in securities registered on a national securities exchange, and securities not so registered, to create actual and apparent active trading in such securities, and to raise and depress the price of such securities, for the purpose of inducing the purchase and sale of such securities by others, in violation of Title 15, United States Code, Sections 78i(a)(2) and 78ff(a); and

  b. commit wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, to transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO – FOUR
## Wire Fraud
## (18 U.S.C. § 1343)

The Grand Jury further charges:

54. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 51.

55. In or about 2024, in the District of Massachusetts and elsewhere, the defendants,

(1) ZM QUANT INVESTMENT LTD,
(2) BAIJUN OU, a/k/a "Eric Ou", and
(3) RUIQI LIU, a/k/a "Ricky Lau",

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Approximate Date | Description |
|---|---|---|
| 2 | February 6, 2024 | Telegram message from OU, a ZM QUANT employee located outside Massachusetts, to Hernandez, located inside Massachusetts, and others. |
| 3 | March 18, 2024 | Teleconference between OU and LIU, ZM QUANT employees located outside Massachusetts, and Hernandez, located inside Massachusetts, and others. |
| 4 | May 31, 2024 | Telegram message from LIU, a ZM QUANT employee located outside Massachusetts, to Hernandez, located inside Massachusetts, and others. |

All in violation of Title 18, United State Code, Section 1343.

## FORFEITURE ALLEGATION
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

56. Upon conviction of one of more of the offenses in violation of Title 18, United States Code, Section 371, relating to conspiracy to commit wire fraud and market manipulation, and Title 18, United States Code, Section 1343, relating to wire fraud, as set forth in Counts One through Four, the defendants,

> (1) ZM QUANT INVESTMENT LTD,
> (2) BAIJUN OU, a/k/a "Eric Ou", and
> (3) RUIQI LIU, a/k/a "Ricky Lau",

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

57. If any of the property described in Paragraph 56, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants –

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 56 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____
FOREPERSON

_____
CHRISTOPHER J. MARKHAM
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: June 27, 2024
Returned into the District Court by the Grand Jurors and filed.

_____ 4:14pm
DEPUTY CLERK